## STATE v BERNSTEIN

Ohio Appeals, 8th Dist, Cuyahoga Co

No 15531. Decided May 24, 1937

292

Frank T. Cullitan, County Prosecutor, Cleveland, and Chas. J. McNamee, Chief Asst. Prosecutor, Cleveland, for plaintiff-appellee.

Payer, Corrigan, Cook & Pilliod, Cleveland, and Henry Galen, Cleveland, for defendant-appellant.

KLINGER, PJ, and GUERNSEY, J. (3rd Dist) and HORNBECK, J, (2nd Dist) sitting by designation.

## OPINION

By GUERNSEY, J.

This is an appeal on questions of law from a judgment of the Common Pleas Court of Cuyahoga County, entered on a verdict of a jury in said court finding the defendant, Alex Bernstein, guilty of embezzlement as charged in the five counts of an indictment returned by a grand jury of said county against the said Alex Bern-

stein at the September Term, 1934, of said court.

The five counts of the indictment, omitting the formal parts, are, respectively, in the words and figures following to-wit:

FIRST COUNT: That Alex Bernstein on or about the 8th day of May, 1929, at the county aforesaid, the said Alex Bernstein being then and there the duly appointed, qualified and acting treasurer of Cuyahoga County, Ohio, and being charged as such officer with the collection, receipts, safekeeping, transfer and disbursement of public moneys belonging to said County of Cuyahoga and State of Ohio, and the various governmental subdivisions within Cuyahoga County, Ohio, did then and there fraudulently and unlawfully embezzle and convert to his own use certain public moneys in the amount and value of $7,963.17, which moneys came into his possession by virtue of his said office as treasurer of Cuyahoga County, Ohio.

SECOND COUNT: That Alex Bernstein on or about the 31st day of August, 1929, at the county aforesaid, said Alex Bernstein being then and there the duly appointed, qualified and acting treasurer of Cuyahoga County, Ohio, and being charged as such officer with the collection, receipt, safekeeping, transfer and disbursement of public moneys belonging to the said County of Cuyahoga, and State of Ohio, and the various governmental subdivisions within said Cuyahoga County, did then and there fraudulently and unlawfully embezzle and convert to his own use said public moneys in the amount and value of $218,281.66 which moneys had come into his possession by virtue of his said office as Treasurer of Cuyahoga County, Ohio as aforesaid.

THIRD COUNT: That Alex Bernstein on or about the 8th day of November, 1929, at the county aforesaid, the said Alex Bernstein being then and there an employee and agent of L. G. Collister the duly elected, qualified and acting Treasurer of Cuyahoga County, Ohio, to-wit: a Deputy County Treasurer, unlawfully and fraudulently embezzled and converted to his own use public moneys in the amount and value of $50,386.95, which moneys had come into his possession by virtue of his employment as Deputy County Treasurer by the said L. G. Collister, Treasurer of Cuyahoga County, Ohio as aforesaid.

FOURTH COUNT: That Alex Bernstein on or about the 15th day of December, 1931, at the county aforesaid, the said Alex Bern-

stein being then and there an employee and agent of L. G. Collister the duly elected, qualified and acting Treasurer of Cuyahoga County, Ohio, to-wit, a Deputy County Treasurer, unlawfully and fraudulently embezzled and converted to his own use public moneys in the amount and value of $427,805.21, which moneys had come into his possession by virtue of his employment as Deputy County Treasurer by the said L. G. Collister, Treasurer of Cuyahoga County, Ohio, as aforesaid.

FIFTH COUNT: That Alex Bernstein between the 3rd day of September, 1929 and the 17th day of December, 1931 at the county aforesaid, the said Alex Bernstein being then and there an employee and agent of L. G. Collister, the duly elected, qualified and acting Treasurer of Cuyahoga County, Ohio, to-wit a Deputy County Treasurer, unlawfully and fraudulently embezzled and converted to his own use public moneys in the amount and value of $476,683.17, which moneys had come into his possession by virtue of his employment as Deputy County Treasurer by the said L. G. Collister, Treasurer of Cuyahoga County, Ohio, as aforesaid.

On motion of the defendant, a bill of particulars on the counts in said indictment was thereafter duly filed by the Prosecuting Attorney of Cuyahoga County, Ohio, in said cause, which said bill of particulars, omitting the formal parts, is in the words and figures following, to-wit:

FIRST COUNT: That on or about the 8th day of May, 1929, the said defendant, Alex Bernstein, as Treasurer of Cuyahoga County, Ohio, settled with the Auditor of Cuyahoga County, Ohio, for all taxes collected during the December, 1928, tax collection period which ended April 26th, 1928; that during said December, 1928, tax collection, to-wit, on or about January 30, 1929, the said Alex Bernstein as County Treasurer, received and accepted as fictitious and pretended payments of real estate taxes the following checks:

1st. Check in the sum of $1254.98 drawn by Shane & Beckerman, on the National City Bank and purporting to cover the payment of taxes entered in Book 27, Bills 85 to 101 inclusive, of the first half of the 1928 tax duplicate of Cuyahoga County, Ohio;

2nd. Check in the sum of $1424.65 drawn by the Huron-Ontario Company on the National City Bank and purported to cover payment of real estate taxes entered in Book 3, Bill 1209 of the first half of the 1928 tax duplicate of Cuyahoga County, Ohio.

3rd. Check in the sum of $5283.54 drawn by the Cornell Realty Company on the National City Bank and purporting to cover payment of real estate taxes entered in Book 5, Bill 501, Book 11, Bill 268, Book 19, Bill 2733, and Book 30, Bills Nos. 612 and 677 of the first half of the 1928 tax duplicate of Cuyahoga County, Ohio;

The total of said alleged payments being $7,963.17. All of the aforementioned tax items were marked "paid" upon said tax duplicate on or about the 8th day of March 1929 but none of said aforementioned checks were presented by the said Alex Bernstein as County Treasurer of Cuyahoga County, Ohio, to the drawee banks for payment prior to said settlement with the County Auditor on the 8th day of May, 1929, or at any time thereafter, nor was any money received in payment of said tax items prior to said settlement day or at any time thereafter.

That said Alex Bernstein in order to balance the charge against him as County Treasurer by reason of marking said items "paid" upon the tax duplicate, and to effect a settlement with the County Auditor for all taxes marked "paid" during the December, 1928, tax collection period, fraudulently and unlawfully embezzled and converted to his own use public moneys in the amount and value of $7,963.17 which moneys were received by him as County Treasurer prior to May 8, 1929, in payment of various other tax items which were not marked "paid" upon the tax duplicate or reported to the County Auditor prior to May 8th, 1929.

SECOND COUNT: That said defendant, Alex Bernstein, as County Treasurer, during his term of office, to-wit, from January 2nd, 1929 to August 31st, 1929, unlawfully and fraudulently failed to charge himself with the receipt of the following public money.

1st: Delinquent personal property taxes in the sum of .......... 17,000.00
2nd: Real estate taxes in the sum of ............ ............ 3,006.53
3rd: Interest on certified delinquent real estate taxes redeemed ...... ...... ............198,275.13

Making a total of ..............$218,281.66

All of said moneys were collected and received by the said Alex Bernstein as County Treasurer during his term of office

as aforesaid, to-wit, from January 2nd, 1929, to August 31, 1929, and the said Alex Bernstein as Treasurer of Cuyahoga County, Ohio, unlawfully and fraudulently failed to report, to the Auditor of Cuyahoga County, Ohio, as required by law, the receipt of the said sum of $218,281.66, during his term as Treasurer of Cuyahoga County, Ohio, and unlawfully embezzled and converted a sum equal to said above amount to his own use, and unlawfully failed and refused to pay over and deliver at the expiration of his term to his successor L. G. Collister, public moneys by him collected and received in the amount and value of $218,281.66.

THIRD COUNT: That the said defendant. Alex Bernstein, on or about the 6th day of November, 1929, as an employee of L. G. Collister, County Treasurer, to-wit, Deputy County Treasurer of Cuyahoga County, Ohio, in direct and immediate control of all moneys received by said Treasurer of Cuyahoga County, embezzled and converted to his own use public funds in the amount and of the value of $50,-386.95, by then and there unlawfully abstracting and withdrawing said sum of $50.386.95 from the Treasury of Cuyahoga County, Ohio and converting the same to his own use.

FOURTH COUNT: That on or about December 15, 1931, and for a period of more than two years prior thereto, Alex Bernstein as Deputy County Treasurer of Cuyahoga County, in actual, immediate and direct control of the funds and records of said office, and the officer and employee who controlled, supervised and directed the making of daily reports to the County Auditor of all tax moneys received by the Treasurer of Cuyahoga County, Ohio; that said Alex Bernstein, as Deputy County Treasurer, unlawfully and fraudulently failed and omitted to charge the Treasurer of Cuyahoga County, Ohio, and unlawfully and fraudulently failed and omitted to report to the Auditor of Cuyahoga County, Ohio, the receipt of tax moneys by the Treasurer of Cuyahoga County between September 30, 1931, and December 15, 1931, in the amount of and value of $427,805.21.

That on or about the 15th day of December, 1931, the Treasurer of Cuyahoga County, Ohio, acting through said Alex Bernstein, Deputy County Treasurer, made his final settlement with the Auditor of Cuyahoga County for all taxes received and marked "paid" on the tax duplicate during the last half of the 1930 tax collection period which commenced June 7, 1931, and ended December 4, 1931.

That said Alex Bernstein, as Deputy County Treasurer, unlawfully misappropriated, embezzled and used the said sum of $427,805.21 of unreported tax moneys to balance a charge against the Treasurer of Cuyahoga County, Ohio, by the Auditor of said county in said sum of $427,805.21 for taxes received by said Treasurer prior to the 4th day of December, 1931 which were charged against the Treasurer of said county and reported to the Auditor, but which were unlawfully abstracted and embezzled by said defendant, Alex Bernstein, as Deputy County Treasurer.

FIFTH COUNT: That said defendant, Alex Bernstein, as Deputy County Treasurer of Cuyahoga County, Ohio, from September 3rd, 1929 to December 17, 1931, was the officer and employee in the office of the Treasurer of Cuyahoga County, Ohio, in actual, direct and immediate control of the funds and records of the Treasurer of Cuyahoga County, Ohio, and during the time aforesaid engaged in a continuous course of fraudulent and unlawful conduct of abstracting, and withdrawing and converting to his own use moneys from the Treasurer of Cuyahoga County. Ohio, which had come into his possession by virtue of his employment, and concealing said unlawful abstractions and withdrawals by making false and fraudulent reports of moneys received by him in the course of his employment as Deputy County Treasurer and by fraudulently failing and wilfully omitting to make reports of or to account for moneys so received by him; that the said Alex Bernstein, as Deputy County Treasurer and during the time aforesaid, being the officer and employee of the Treasurer of Cuyahoga County who supervised, controlled and directed the making of daily reports to the Auditor of Cuyahoga County, Ohio, unlawfully and fraudulently falsified said daily reports to the County Auditor and failed and omitted to report the full, true and correct amount of taxes received daily by the Treasurer of Cuyahoga County; that on or about the 17th day of December, 1931, the total amount and value of public funds embezzled by said Alex Bernstein as Deputy County Treasurer, in the manner and during the time aforesaid, was $476,683.17; that the exact amount and time of each separate abstraction is unknown and therefore cannot with certainty be alleged.

Separate demurrers were thereafter filed to the first and fourth counts of the indictment which were overruled by the court and to which rulings the defendants excepted.

Upon trial in the Common Pleas Court the jury returned a verdict finding the defendant, Alex Bernstein, guilty as to all the counts of the indictment and finding the value of the property by him embezzled on the first count to be $7962.17; on the second count $218,281.66; on the third count $50,386.95; on the fourth count $427,805.21; and on the fifth count $476,683.17. Motion for new trial was filed and overruled and judgment was then entered on the verdict as follows: That the said defendant, Alex Bernstein be imprisoned and confined in the Ohio State Penitentiary, Columbus, Ohio for an indeterminate period and that he pay a fine of $15,926.34 as to the first count of the indictment; that he be imprisoned and confined in the Ohio State Penitentiary for an indeterminate period and pay a fine of $436,563.32 as to the second count in the indictment; and that he be imprisoned and confined in the Ohio State Penitentiary for an indeterminate period as to the third count of the indictment; and that he be imprisoned and confined in the Ohio State Penitentiary for an indeterminate period as to the fourth count in the indictment; and that he be imprisoned and confined in the Ohio State Penitentiary for an indeterminate period as to the fifth count of the indictment; and that he pay the costs of prosecution for which execution is awarded. It was further adjudged that the sentences in the second, third, fourth and fifth counts in the indictment run concurrently with sentence in the first count in the indictment.

It is from this judgment that the appeal to this court is taken.

The bill of exceptions in this case contains almost nineteen hundred pages of evidence and there are more than a thousand exhibits in the case, and it is therefore impossible to discuss the evidence in detail so only such facts will be mentioned as are deemed material to the conclusions we reach in this case, and in some instances the ultimate facts shown by the evidence will be mentioned instead of the evidential facts upon which such ultimate facts are based.

As shown by the evidence, Ralph McBride served as Treasurer of Cuyahoga County, Ohio, for two terms ending September 7, 1925, at which time he was succeeded by Walter Cook who had been elected to said office. Cook took office September 8, 1925, his first term extending from that date to September 3, 1927. Having been re-elected he started his second term upon the expiration of his first term and continued to serve as Treasurer until December 31, 1928. At the preceding election Cook had been elected a Commissioner of Cuyahoga County and resigned as Treasurer to accept the office of County Commissioner and Bernstein was appointed as Treasurer by the County Commissioners to fill out the unexpired term of Cook. Bernstein's term as Treasurer under this appointment commenced on January 1, 1929, and continued until August 31, 1929. After August 31, 1929, L. G. Collister who had been elected County Treasurer at the preceding general election, succeeded Bernstein, his first term ending August 31, 1931. He had been re-elected to the office, his second term commencing with the expiration of his first term and extending to August 31, 1933.

Bernstein became Chief Deputy County Treasurer in the year 1921 and continued under appointments made by Treasurers McBride and Cook to serve as such deputy until he commenced his ad interim term as Treasurer in January, 1929, from which day until the expiration of his ad interim term on August 31, 1929, he served as Treasurer. He was again appointed as Chief Deputy County Treasurer by Collister and continued to serve in that capacity until some time after May, 1933. During the time Bernstein was Treasurer he performed practically the same duties he performed during all the periods he had been Chief Deputy County Treasurer, together with such additional duties as were necessary to be performed by him as titular head of the office of Treasurer.

The first two counts of the indictment relate to transactions which are charged to have occurred while the defendant, Bernstein, was acting under appointment by the County Commissioners as County Treasurer of Cuyahoga County, Ohio, and are based upon the provisions of §12873 GC which will be hereafter referred to

On December 18, 1931, State Examiner James N. Main began his examination of the records and funds of the County Treasurer of Cuyahoga County. He made a count of all the assets in the Treasurer's office. Among the assets exhibited to him by Bernstein were "hold checks" in the approximate sum of $186,000.00. Some of these checks had not been presented to a bank for payment and some of them were

dated at least three years previous to December, 1931. As Bernstein handed these checks to Mr. Main he stated to the latter, "You are putting a rope around my neck."

While the count of the State Examiner was in progress on this day, Bernstein was asked if any collections were coming in. On this same day he was asked twice by the State Examiner if he had reported to the County Auditor all taxes which had been collected. His reply to the first question was that no taxes were being collected, and to the second that he had reported all taxes collected to the County Auditor. The testimony of Mr. Main in this connection is corroborated by the testimony of Mr. A. B. Peckinpaugh, head of the State Bureau of Inspection and Supervision of Public Offices.

The June, 1931, tax collection period had ended December 15, 1931, and all tax duplicates were in the possession of the County Auditor. When Bernstein told Main that he had reported all taxes collected to the Auditor, the examiner had no immediate means available to determine the truth or falsity of that representation. Tax stubs representing payments which had not been made were not delivered or submitted to the examiner. However, a few weeks later when the examiner was inspecting the Treasurer's general ledger he found that between December 19, 1931 and December 31, 1931, tax payments amounting to $421,486.50 had been reported to the County Auditor. Upon discovering this fact Main asked Bernstein where these tax payments were coming from and Bernstein replied that they were advance payments being made by taxpayers who were leaving the county for the winter.

Main then requested Bernstein to deliver the stubs covering these payments to him. Bernstein failed to do so but promised to deliver them as soon as they were in a "presentable condition." A week later and then a week or ten days after that, the Examiner again requested Bernstein for these stubs. At the time of the last noted request, Main proceeded to the office of Mr. Sensel, head of the bookkeeping department, and asked him for the stubs and Bernstein, who had followed him, then told Sensel to let him have them. Upon inspection of these stubs Main found that 2416 tax items amounting to $475,099.17 had been received by the Treasurer's office prior to December 18, 1931, which were not at that time reported to the County Auditor.

As the County Auditor's books were in apparent balance with the Treasurer's office upon December 18, 1931, it appeared that unreported tax moneys in the amount of $475,099.17, were being used to force a balance with the Auditor's charge against the Treasurer for the previous tax collection which had closed.

From this disclosure it also appeared that Bernstein had falsified on December 18, 1931, when he twice stated that all taxes collected had been reported to the Auditor, and he falsified again when he represented to Main that the taxes reported between December 19th and December 31, 1931, were made by taxpayers straightening up their taxes before leaving the county for the winter.

The unreported sum of $475,099.17 was deposited in the bank to the credit of the Treasurer or in his possession as part of the assets of the office. All of it was used to balance the Auditor's charge against the Treasurer's office for taxes collected. By using this money for this purpose the accounts of the Auditor and Treasurer were in apparent perfect balance as of December 18, 1931. If the amount of these tax stubs had been properly reported the Treasurer would then have shown a shortage in the sum of $475,099.17, being the aggregate of such stubs. This item of $475,099.17 does not include the item of "hold checks" amounting to $186,000.00, $94,000.00 of which were later made good, and "white slips" representing advances to employees of the Treasurer's department amounting to approximately $17,000.00 all of which were later redeemed.

Following the discovery of this situation the State Examiner caused the Treasurer's office to be closed for a period of about two weeks in April, 1932, for the purpose of making a detailed audit of the treasury.

After the re-opening of the office examination continued for a number of months.

Not being able to determine from the bookkeeping records of the Treasurer and the Auditor where the shortage originated, the State Examiner and his assistants in the course of their examination gathered together all the tax stubs in the court house, marked "paid" and built up from them a daily record of tax collections. No tax stubs being available beyond September, 1925, the commencement of Cook's first term as County Treasurer, they started at that date and made up their audit from that date to April 1, 1932. This required the handling of over seven million stubs. These stubs were separated according to

the pay dates appearing thereon, and by this procedure there was determined the amount of taxes received each day from 1925 until the end of 1931. Because the cash book in the bookkeeping department recorded the receipt of tax moneys as of the date entered rather than the date of actual payment it was necessary to reconstruct the cash book by ascertaining the daily receipts from the "paid marks" on the tax stubs. When the daily receipt of taxes was thus ascertained, a comparison of each day's receipts of taxes with the amount reported daily to the auditor disclosed the amount of unreported tax moneys on hand each day. Tax stubs were missing for some of the days during this period. However, in all cases where there was any question as to the time when money was received, either by reason of missing stubs or illegible record, the date of the bookkeeper's entry of payment was accepted as correct. The result of this audit was to disclose a daily shortage in the undivided tax fund from August 1926 to January 1, 1932. The amounts of the shortages for each and every day are not in evidence but the amount of the shortage at the end of each Treasurer's term and on December 18, 1931, and upon the date of the closing of the Treasurer's office in April, 1932, is shown.

From the examination and other evidence in the case, the following facts appear:

When the treasurer, Cook, took office on September 8, 1925, he receipted to Treasurer, McBride, for the sum of $24,775,595.54. The first term of Treasurer Cook extended from September 8, 1925 to September 3, 1927, and in addition to the above sum Treasurer Cook, during said period, received from all sources $184,746,703.31. Both sums added together make a total receipt in the first term of Cook of $209,522,293.85. According to the bookkeeping records as found by the State Examiner, Cook disbursed during his first term of office $181,910,420.09 leaving a balance that should have been in the treasury at the end of Cook's first term of office of $27,611,873.76. According to the State Examiner's analysis of the figures of the first term of Walter Cook the amount that was reported as being in the county treasury at the conclusion of Cook's first term, was $26,010,417.45. From these figures it appears that Cook finished his first term of office with a deficit of $1,601,461.31. Cook succeeded himself and one term merged into the other and the deficit mentioned is nowhere reflected in the bookkeeping records of the

county but is determined from the State Examiner's audit.

The second term of Cook extended from September 4, 1927 to December 31, 1928, when he gave up the office of Treasurer to become a County Commissioner.

Cook started his second term with the sum of $26,010,417.45 reported as being in the county treasury at the conclusion of his first term. As shown by the Examiner's audit, Cook collected from all sources during his second term, $117,582,452.13, which added to the reported treasury balance of $26,010,417.45 at the end of his first term, made a total received by Cook in his second term of $143,592,871.58. Cook disbursed throughout his second term $135,150,851.22 which should have left a balance in the treasury at the time Cook relinquished his second term of office of $8,442,020.36. In reality, at the end of Cook's administration there was in the county treasury a balance of $9,206,761.80 or $764,741.44 in excess of what Cook had received during his second term. Or, in other words, the deficit of $1,601,461.31 existing at the end of Cook's first term had been reduced during his second term by the sum of $764,741.44 so that at the end of his second term the then deficit amounted to $836,719.87. Upon this deficit is credited the sum of $16,323.31 representing tax money turned over to Cook when he took office not covered by tax stubs which were found, leaving a net deficit or shorage at the time Cook relinquished the office, of $820,391.56.

When Bernstein took office on January 2, 1929, he receipted to Treasurer Cook for $9,206,761.80. If the balance of receipts over expenditures during Cook's two terms of office had been received by him the amount received by him would have been $10,043,481.69.

Bernstein took office on January 2, 1929, receiving from Treasurer Cook a balance of $9,206,761.80 as above mentioned. Bernstein received during his term of office as Treasurer, from taxes and other sources, $99,436,247.30 which added to the amount received from Cook made a total that Bernstein had in his possession from the beginning of his term to the end, of $108,643,009.17. Bernstein disbursed during his term of office $78,431,447.98, which should have left him with a balance on hand at the conclusion of his term of $30,211,561.17. Bernstein at the conclusion of his term turned over to succeeding Treasurer, L. G. Collister, $30,737,575.21 or $526,014.02 in excess of what he received during his term. Or, in other words, the shortage of $820,-

391.56 which existed at the end of Cook's second term had been reduced during Bernstein's term, by the sum of $526,014.02 so that at the end of his term it amounted to $294,377.54.

L. G. Collister became treasurer on the 3rd day of September, 1929, succeeding Alex Bernstein. He receipted to Bernstein for $30,737,575.21. His first term extended to September 6, 1931. During his term he collected taxes in the amount of $164,415,-245.92. Other receipts for the same period were $49,102,462.31. During this period he disbursed $219,099,376.79. Based on these figures Collister's treasury balance at the end of his first term should have been $25,-155,906.55. He reported as his balance $23,-981,759.34 so that the deficit at the end of his first term was $1,174,147.21 not including the deficit of $294,377.54 which existed at the end of Bernstein's term and at the commencement of Collister's first term.

Commencing with the beginning of Collister's second term on September 6, 1931, the examination covers the period to April 23, 1932. As stated above, Collister started his second term with a reported balance on hand of $23,981,759.34. He collected from taxes during his period $38,136,466.55 and from other receipts $11,024,474.41, a total of $73,142,700.30. He disbursed between September 8, 1931 and April 23, 1932, $55,520,398.54. So considering that period alone he should have had on hand $17,-622,301.76 but he actually had on hand $18,613,063.49 or an excess for the second period covered by the examination of $990,-761.73. This excess, determined in the second period of Collister's term of office, subtracted from the deficit of $1,174,147.31 determined to be the deficit at the conclusion of his first term, leaves a net deficit for the entire period of Collister's incumbency covered by the examination of $183,-385.58, exclusive of the deficit which existed at the commencement of his term. The deficit of $294,377.54 existing at the end of Bernstein's term, added to the deficit of $183,385.58, makes a total of $477,-763.12 which is the total net deficit for the entire period from 1925 to April 23, 1932, covered by the examination. By some adjusting entries this deficit was reduced to $477,760.71 which is the final figure.

It will be noted that this final figure of $477,760.71 of the deficit is but $2,661.54 in excess of the amount of the tax stubs turned over by Sensel to the State Examiner, representing tax collections which had not been reported.

As shown by the audit, on May 8, 1929,

which was the settlement date for the December, 1928, collection, the treasurer's office had collected $906,324.76 which was not reported but which had been deposited to the credit of the treasurer and which had the effect of forcing a balance with the Auditor and concealing the amount of the then-existing shortage in the treasury funds.

In every subsequent tax settlement covered by the evidence, there were unreported tax collections as follows:

| | |
|---|---|
| Octobr 29, 1929, | $689,084.20 |
| May 15, 1930 | 554,889.52 |
| December 6, 1930 | 470,472.06 |
| June 6, 1931 | 545,767.50 |
| December 15, 1931 | 427,805.21 |

The plan or scheme adopted during all the period covered by the examination in order to conceal the fluctuating shortage which existed in the office of the Treasurer during all of said period, consisted of withholding from the Auditor a correct statement of taxes collected, which was accomplished by withholding from credit on the Auditor's books tax stubs evidencing tax payments received equivalent in amount to the shortage sought to be concealed, and using the cash represented by these stubs as a deposit to the treasury account to balance the amount reported to the Auditor as being collected. This was accomplished by making false daily reports to the Auditor showing the Treasurer chargeable with an amount less than he was legally chargeable equivalent to or greater than the amount of the then existing shortage.

At page 1811 of the record, on cross-examination of Mr. Bernstein, the following question was propounded to him:

"Q. Mr. Bernstein, do you know of any way in which a shortage in the treasury could be concealed for a long period of time, except by withholding certification from the Auditor and withholding tax stubs from the record and using the money for the purpose of forcing a balance with the Auditor?"

To this question Mr. Bernstein answered, "No."

It further appears from the evidence that Mr. Bernstein during the entire period covered by the examination, either as Chief Deputy County Treasurer or as County Treasurer, was in direct charge of the treasurer's office and the superior of all persons employed therein, and that except for a few

different days, he furnished the figures of "undivided tax" incorporated in the daily certification to the Auditor; that the other figures on which this report was based were checked by employees of the office in addition to Bernstein, and correctly reflected the transactions of the office but that the figure of "undivided tax" furnished by Bernstein was subject to check by him alone and did not reflect the true condition of this item but was made for such an amount less than the treasurer was properly chargeable with on this item, to cover the shortage then existing in the accounts of the treasurer. During the few days on which Bernstein was not personally present to furnish the figure of undivided tax, it was supplied by another employe of the office as directed by him.

There is also evidence that Bernstein in his direction of the work of the Treasurer's office controlled the flow of tax stubs from the collection departments of the Treasurer's office to the bookkeeping department, and that he maintained a private compartment in the safe in the Treasurer's office in which he kept cash and tax stubs.

Some of the computations for separate days covered by the examination of the State Examiner are incorrect but such errors do not affect the findings of the examiner as to the shortages existing at the termination of the various terms of office hereinbefore referred to, or on December 15, 1931, or on April 23, 1932.

Examiner Main and other state examiners had made several examinations of the Treasurer's office during the period covered by the examination in question, prior to the examination following the discovery of the shortage but did not find any shortages during such previous examinations. Main's explanation of the failure to discover the shortages in the previous examinations is that it did not come to the notice or attention of the examiners that tax stubs were being withheld from record.

Clewell Smith, a public accountant, was employed by Collister, Treasurer, after the discovery of the withholding of tax stubs, to make an audit of the Treasurer's office covering the same period the State Examiner covered in his audit. He worked at the same time the State Examiner was making his examination but did his work independent of the work done by the State Examiner.

The original amount he arrived at as the net shortage for the period covered by the examination was $477,760.71. This fig-

ure was later modified so that his final finding of the net shortage was $480,251.13.

In the course of his audit, he examined the paid real estate tax stubs and paid personal property tax stubs and the Treasurer's so-called cash books and the daily report, sworn reports to the County Auditor, and the journal kept by the County Auditor, and the deposit slips and bank records. In his use of the deposit slips he made a very extensive trace of the amounts represented on those slips through the various banks of deposit and also made use of the bookkeeper's daily reports of daily collections of the cashier's in the front office. He found a series of manipulations prior to October 2, 1926, but manipulations of that nature prior to October 2, 1926, were of large amounts or even amounts. Starting in October, 1926, he was unable to trace the manipulations in any degree except that the books were never in balance; the stubs with the amounts represented, except at the end of the collection, for any time were never from then on in balance. He did not attempt to reconstruct the cash book of the treasurer's office by sorting and totalling the paid stubs every day except in respect to collections which he designated "carry over collections" and which were collections made during the current collection, which were really for the following collection and it was only in this respect that he re-allocated the stubs. Operating in this method he found that on April 19, 1926, which was the close of the first half of 1925, there were many collections which had been unreported totalling $307,893.24, and at the end of each subsequent collection period down to the end of the period covered by his examination he found amounts of unreported taxes as follows:

On October 1, 1926, which was the end of the last half of the 1925 collection, there were unreported taxes collected totalling $261,217.72; on October 14, 1927, which was the last half of 1926, unreported taxes totalling $496,510.77; on October 26, 1928, which was the last half of 1927, the amount was $492,929.02; on December 31, 1928, which was the end of Walter Cook's term of office, $830,775.50; May 8th, 1929, which was the close of the first half of 1928, $739,-964.46; August 31, 1929, which was the close of Bernstein's term of office as Treasurer, $510,250.07; October 29, 1929, which was the last half of 1928, $685,871.81; December 5, 1930, last half of 1929, $457,167.23; December 15, 1931, which was the last half of 1930, $425,733.61; and on April 22, 1932,

which was the close of the first half of 1931, $480,251.13, which is the net deficit for the entire period covered by his examination.

Upon his examination he further found that the amounts of unreported taxes above mentioned. had been deposited in the county depositaries to the credit of Cuyahoga County and was there to the credit of the treasurer at the time the settlement was made with the auditor for the previous collection.

In comparing the summaries of the independent audit of Main and Smith, the following differences in the amounts of the deficits existing at the termination of the various periods covered by both audits will be noted:

| | Main Audit | Smith Audit |
|---|---|---|
| End of Cook's term of office | 820,391.56 | 830,775.50 |
| End of Bernstein's term | 294,377.54 | 510,250.07 |
| December 15, 1931 | 427,805.25 | 425,733.61 |

It will also be noted that as shown by Smith's audit, the maximum deficit of $830.775.50 existed at the end of Cook's term. on December 31, 1928, and that this had decreased by the end of Bernstein's term as treasurer to $510,250.07, and had then increased to $685,871.81 by October 29, 1929, and this shortage at each subsequent collection period to and including December 15, 1931, had decreased until on the last mentioned date it stood at $425,-733.61; and that between this date and April 22, 1932, it had increased to the sum of $430.251.13.

During the period covered by both audits one tax collection frequently merged into another and at times when the collections were the heaviest it was a physical impossibility to credit all taxes on the duplicate on the day received, and that for this reason at certain times entries of tax payments on the duplicate were made a day or so after receipt, and that in the period of transaction from Cook's first term to his second term as Treasurer, the allocation of taxes collected as between the two terms was not made with the same particularity that it could have been made if Cook at the end of his first term, had been succeeded by another person as treasurer; and this is also true as to the transition from Collister's first term to his second term.

And as Main's finding of deficits at the different dates above mentioned, is based on the failure to enter payments on the

records on the day received, and Smith's audit is based on payments received actually credited to the payment of taxes represented thereby, whether on the day received or later, the Smith audit reflects actual shortages existing on the dates referred to in his audit, while the Main audit reflects accounting shortages on the dates referred to in his report.

The "hold checks" amounting to $186,-000.00, $94,000.00 of which were later made good, and the "white slips" representing advances to employees of the Treasurer's department, amounting to approximately $17,000.00, all of which were later redeemed, were not included in the shortages found by Clewell Smith and the item of "hold checks" consequently does not reflect on the embezzlements charged in the indictment which are based on the count of tax stubs and disbursements.

After the death of Goodman, a deputy in the Treasurer's office, unpaid checks aggregating approximately $70,000.00 payable to the various treasurers who had been in office since 1921, apparently given to cover taxes due the county were found at the decedent's home. There are no entries on any books in the treasurer's office. reflecting these checks or tax payments representing same, and such checks consequently were not considered in connection with the shortage and do not reflect on the amount of the shortage.

There were many employees in the treasurer's office and the systems of accounting in the office were cumbersome and there were many irregularities in the conduct of the office, but there is no evidence tending to show that any employee of the office other than Bernstein was guilty of embezzlement except evidence that another of the employees at one time embezzled the sum of $2000.00 which was discovered and made good and the employe discharged. There is also evidence that every employe in the office other than Bernstein, handling funds of the office, was subject to a daily check of the funds coming into his hands and that upon such daily check inaccuracies to the extent of only a few cents or a few dollars were ever discovered.

After the release of the State Examiner's report following the close of the Treasurer's office in April, 1932, Treasurer Collister and other employees of the Treasurer's office, at different times appealed to Bernstein to give an explanation of the reported shortage. To these appeals he responded by statements such as "I don't remember—how do I know there isn't a dicto-

graph in this room." "Well, I am just a good soldier. I obey instructions and follow the leaders and I have nothing more to say on the subject." And "If I start to talk I will blow the lid off the town."

There is no direct evidence of the abstraction of funds of the treasury by the defendant Bernstein, and the case of the state against him rests wholly on the circumstantial evidence above and hereafter, set forth. There is also no evidence that Bernstein lived beyond his means or of any investments made by him indicating the possession of funds represented by the shortage.

In addition to the above evidence, the evidence on the various counts against Bernstein may be summarized as follows:

COUNT 1. The checks referred to in the first count and the bill of particulars with reference thereto, were received during Bernstein's incumbency as treasurer about January 30, 1929. They were never presented to a bank for payment. The taxes covered thereby were marked "paid" upon the tax duplicate during the same tax collection period, to-wit, March 8, 1929. On May 8, 1929, Bernstein as Treasurer settled with the Auditor for the taxes marked "paid" as aforesaid, by causing unreported tax moneys from other sources to be credited on the Auditor's books as being given in payment for the unpaid taxes represented by said checks which had been marked "paid" upon the tax duplicate.

These checks were held by him during all of 1929, all of 1930 and all of 1931, and until early in 1932, when they were delivered to the prosecuting attorney. They were never presented for payment and no money was ever paid to the treasurer by the makers of these checks or anyone acting in their behalf.

COUNT 2. During the time Bernstein served as treasurer from January 1, 1929 to August 31, 1929, he received the sum of $198,000.00 in interest; $17,000.00 in delinquent personal property tax payments, and $3006.00 in real estate taxes which he failed to report as treasury receipts, to the County Auditor. These moneys were deposited by him to his credit as treasurer. He delivered to Collister as his successor an amount exactly equal to the county auditor's charge against himself as treasurer. The auditor had not charged him with the receipt of the items above mentioned, amounting to $218,281.66 because Bernstein had not reported them. However, during the period mentioned Bernstein, as shown by both the Smith and Main

audits, paid into the county depositaries to the credit of the Treasury, an amount largely in excess of all amounts received by him in his official capacity including such items during such period.

The testimony of examiner Main as to Bernstein's manipulation of unreported taxes, is as follows:

"I found that by using his figures which appeared each and every day, beginning on June 10, 1929, charging him with the amount he charged against himself and crediting him with the amount he reported to the auditor, on or about June 12, 1929, I set up an unreported figure of taxes amounting to $300,000.00, which continued until the latter part of August, 1929, except for a few variations."

COUNT 3. On November 8, 1929, Bernstein was Chief Deputy County Treasurer. As of the beginning of business on that day he reported the cash assets of the treasurer's office as amounting to $65,219.35. During the day there was received by the treasurer's office, cash amounting to $96,725.00 which was obtained by cashing treasurer's warrants for this amount. This cash was delivered to the Treasurer's office by the Brinks Express Company and receipted for by Deputy Treasurer Charles Carner. The total amount of cash disbursements made by the treasurer on November 8, 1929, were definitely and accurately ascertained and amounted to $27,708.41. By giving effect only to the cash receipts of $96,725.00, adding that amount to the cash on hand at the beginning of the day and deducting therefrom all lawful disbursements, the amount of cash which should have been in the treasury at the end of the day amounted to $134,235.94. Bernstein reported $83,848.99 cash on hand, leaving a difference of $50,386.95 cash unaccounted for, which is the amount charged to have been embezzled. That it was the custom of the treasurer's office during this period, to furnish cash for the payrolls of certain contractors, and to accept the checks of such contractors for the cash furnished to them, and carry such checks as assets of his office, in the place of the cash furnished. It was also the custom to cash checks for other persons and carry these checks in the same manner. Examiner Main testified cash in personal checks, which was the practice of the office, could have gone out of the treasury on that day. There was sent to the depositary on that day, the sum of $174,425.82, the items of

which deposit are not shown by the evidence.

Bernstein, as chief deputy, was in control of the cash of the office. Examiner Main testified that under the system as he found it in effect during the years covered by his examination it would have been possible for the person in charge of the balancing of the office, and in the reporting of the receipts each day, to withhold a certain amount from the cash drawer each day and effect an accurate balance with the assets as counted.

The two warrants that were cashed on November 8, 1929, amounting to $96,725.00 were carried by Bernstein as part of the assets listed on the daily report of November 7th.

The amount of unreported taxes each business day for the period extending from November 1st to November 15th, 1929, including November 8, 1929, on which date the embezzlement covered by this count is charged to have been committed, as shown by the Main audit, are as follows:

November 1st, 1929, $765,000.00; November 2nd $772,000.00; November 4th, $789,-000.00; November 5, $805,000.00; November 6th, $859,000.00; November 7th, $874,000.00; November 8th, $803,000.00; November 9th, $718,000.00; November 12th, $681,000.00; November 13th, $679,000.00; November 14th, $603,000.00; November 15th, $564,000.00.

COUNT 4. Alex Bernstein, as deputy county treasurer, on or about December 15, 1931, and for a period of more than two years prior thereto, failed and omitted to charge the treasurer of Cuyahoga County with, and failed and omitted to report to the Auditor of Cuyahoga County, the receipt of tax moneys by the treasurer of Cuyahoga County, between September 30, 1931 and December 15, 1931, in the amount and value of $427,805.21. That on or about December 15, 1931, the Treasurer of Cuyahoga County made his final settlement with the Auditor of Cuyahoga County for all taxes received and marked "paid" on the tax duplicate during the last half of the 1930 collection period which commenced June 7, 1931, and ended December 4, 1931. That said sum of $427,805.21 of unreported tax moneys were used by him to balance a charge against the treasurer of Cuyahoga County by the auditor of said county in said amount for taxes received by said treasurer prior to the 4th day of December, 1931, which were charged against the treasurer of said county and reported to the auditor. However, the Smith audit shows the deficit in the Treasurer's office

which had been $685,871.81 on October 29, 1929, had decreased to $467,871.81 on December 15, 1930, and had further decreased to $425,733.61 on December 15, 1931, so that it is apparent that Bernstein paid into the treasury more money than he received during the period covered by this count, and that this money was credited by him to the wrong accounts in order to conceal a shortage in such accounts existing prior to the period covered by this count.

COUNT 5. The evidence upon which the fifty count of the indictment is based, is set forth in the general statement of facts.

Based on the overruling of demurrers to the first and fourth counts of the indictment, the overruling of the motions to direct a verdict in favor of the defendant, made at the close of the plaintiff's evidence and at the close of all the evidence, and on exceptions to the charge of the court, and on the overruling of motion for new trial, the appellant specifies in his brief, the following errors set forth in his assignment of errors.

1. That the verdict and judgment on each count of the indictment is contrary to law in that no offense is charged in the first and fourth counts of the indictment as limited by the bill of particulars, and in that there is no evidence tending to prove the commission by the defendant of any of the offenses charged in any of the counts of the indictment, and in that the verdict and judgment on each and every count of the indictment is not sustained by any evidence.

2. That the verdict and judgment are not sustained by sufficient evidence.

3. That the court erred in its charge to the jury.

These assignments of error will be discussed in the order mentioned.

1. In considering the questions raised by the first assignment of error, it is well to keep in mind that when the prosecuting attorney files a bill of particulars, the state is confined to the items therein set down. 14 R.C.L. 191. This rule applies to each count of the indictment.

The first two counts of the indictment relate to transactions which occurred while defendant was acting under appointment by the county commissioners, as county treasurer of Cuyahoga County, Ohio, and are based upon the provisions of §12873 GC, which reads as follows:

"Sec 12873 GC. Embezzlement of public money; deposit with bank. Whoever, being charged with the collection, receipt, safekeeping, transfer or disbursement of public money or a bequest, or part thereof, belonging to the state, or to a county, township, municipal corporation, board of education, cemetery association or company, converts to his own use, or to the use of any other person, body corporate, association or party, or uses by way of investment in any kind of security, stock, loan, property, land or merchandise, or in any other manner or form, or loans with or without interest to a company, corporation, association or individual, or, except as provided by law, deposits with a company, corporation, or individual, public money or other funds, property, bonds, securities, assets or effects received, controlled or held by him for safekeeping or in trust for a specific purpose, transfers or disbursement, or in any other way or manner, or for any other purpose, shall be guilty of embezzlement of the money or other property thus converted, used, invested, loaned, deposited or paid out, and shall be imprisoned in the penitentiary not less than one year nor more than twenty-one years and fined double the amount of money, or other property embezzled."

The above action, which was known as §6841, Revised Statutes, was originally enacted in what is known as the Independent Treasury Act, passed in 1858 (2 S & C 1610). This section together with the statutory provisions which were later designated as §7299, Revised Statutes, constituted but one section (§15) of that Act, and it was held in the case of State v Meyers, 56 Oh St page 340, that said §§6841 and 7299 are in pari materia and must be read and construed together.

Sec 7299 Revised Statutes, later was designated as §13674 GC. §13674 GC was repealed by an Act to revise and codify the law of criminal procedure of Ohio, 113 Ohio Laws, 123, and was re-enacted as §13444-25 GC. The provisions of §13444-25 GC are the same as those of original §7299 Revised Statutes (later §13476 GC) and bear the same relation to §12873 GC as the provisions of §7299 R.S. bore. It is as follows:

"Sec 13444-25 GC. What is prima facie evidence of embezzlement by public officers.

"Failure or refusal to pay over, or produce the public money or part thereof, by an officer or other person charged with the collection, receipt, transfer, disbursement or safekeeping of such money or part thereof, whether belonging to the state or a county, township, municipal corporation or board of education in this state, or other public money, or to account to and make settlement with a legal authority of the official accounts of such officer or person, shall be prima facie evidence of the embezzlement thereof. Upon the trial of such officer or person for the embezzlement of public money under any provisions of the law, it shall be sufficient evidence for the purpose of showing a balance against him, to produce a transcript from the books of the auditor of state, auditor of county or the records of the commissioners of the county. The refusal of such officer, or person, whether in or out of office, to pay a draft, order, or warrant drawn upon him by an authorized officer, for public money in his hands, or a refusal by a person or public officer to promptly pay over to his successor public money or securities on the legal requirement of an authorized officer of the state or county, on the trial of an indictment against him for embezzlement, shall be prima facie evidence thereof."

It will be noted that under the provisions of §12873 GC, the person chargeable with the commission of an offense is "whoever, being charged with the collection, receipt, safekeeping, transfer or disbursement of public money or a bequest, or a part thereof, belonging to a county, township, board of education, cemetery association or company;" and the subject matter to which the offense relates is "public money or other funds, property, bonds, securities, assets or effects received, controlled or held by him for safekeeping or in trust for a specific purpose, transfer or disbursement or in any other manner or for any other purpose;" and the four classes of acts by the person chargeable with reference to the subject matter, which constitute embezzlement under the provisions of said section, are:

1. Converts to his use or to the use of any other person, body corporate, association or party.

2. Uses by way of investment in any kind of security, stock, loan, property, land or merchandise or in any other manner or form.

3. Loans with or without interest to a company, corporation, association or individual.

4. Except as provided by law, deposits with a company, corporation or individual.

In accordance with what is commonly known as the rule of ejusdem generis, where in a statute. general. words follow a designation of particular subjects ▇▇ or classes of persons, the meaning of the general words will ordinarily be construed as restricted by the particular designation and as including only things or persons of the same kind, class or nature as those specifically enumerated, unless there is a clear manifestation of a contrary purpose. 37 O. J. 779, 25 R.C.L. 996; Lewis' Sutherland Statutory Construction, Second Edition, Volume 2, page 814.

Applying this rule to the construction of the clause incorporating the second class of acts constituting offenses ▇▇ above set forth, the general words "or in any other manner or form" following the designation of particular subjects of use by way of investment, there being no clear manifestation of a contrary purpose, are restricted by the particular designation and include only uses by way of investment.

The acts constituting embezzlement under this section are therefore limited to acts of conversion, using by ▇▇ way of investment, loaning and, except as provided by law, depositing public funds as therein defined.

Neither of the first two counts of the indictment as confined by the bill of particulars, charge the defendant with the investment, loaning or deposit of public funds in contravention of the provisions of said section, and the evidence affirmatively shows that such funds were not invested, loaned or deposited in contravention of the provisions of said section, and that the funds charged to have been embezzled were deposited in the depositaries provided by law. The question to be determined, therefore, is whether the acts charged in these two counts of the indictment, as confined by the bill of particulars and shown by the evidence, establish a conversion of public funds constituting embezzlement under the provisions of said section.

In 20 Corpus Juris at page 432, it is stated:

"As in the case of other servants or agents, a conversion is necessary to constitute the offense of embezzlement by a public officer or employee; that is, it is essential that the owner should be deprived of the property embezzled, by an adverse holding or use."

In the case of Dickey v State, Court of Criminal Appeals of Texas, 144 SW 271 it was held:

"A city secretary cannot be convicted of misapplying a warrant belonging to the city, where he actually deposited the warrant in a bank to the credit of the city, although he deposited it to the credit of a wrong fund for the purpose of covering up a shortage in that fund."

The court, in its opinion in this case, cites in support of this proposition, the case of Com v Este, 140 Mass. 279, 2 NE 769, and quotes from the opinion delivered by Justice Holmes who later became a member of the Supreme Court of the United States, as follows:

"The fact that the payment was a means of embezzling other money in the future, or covered up an embezzlement of other money in the past, would not make it an embezzlement of the money paid. Neither would the fact that he represented it to the town (not to the payee) as the payment of other town money; that is, as a payment from his balance on hand and not from the notes. Embezzlement retains so much of the character of larceny that it is essential to the commission of the crime that the owner should be deprived of the property embezzled, by an adverse holding or use."

To the same general effect is the decision in the case of Gibson v State, Court of Appeals of Georgia, 79 SE Rep. 354.

And in the case of Beard v State, 18 Abs 430, the Court of Appeals of the 3rd Dist., in a prosecution for embezzlement based upon the provisions of §12467 GC held:

"The conversion essential to the offense of embezzlement includes depriving the owner of his property or money by an adverse using or holding."

Motion to file petition in error in this case was overruled by the Supreme Court February 20, 1935.

From all the authorities mentioned, it is clear that under the provisions of §12873 GC, the conversion essential ▇▇ to the offense of embezzlement includes depriving the owner of his property or money by an adverse using or holding and a county treasurer is not guilty of embezzlement of public funds under the provisions of this section where he actually deposited

306

such funds in a bank to the credit of the county, although he credited it to a wrong fund for the purpose of covering up a shortage in such fund.

The legislature unquestionably had the power to make the failure of a public officer to report the collection of public funds to the proper account and the reporting and crediting of such funds to wrong accounts in order to conceal shortages in such accounts an offense but it did not do so in the provisions of §12873 GC, and this is a matter for legislative rather than judicial action. State v Myers, 56 Oh St 340.

Passing from this subject for the present, we will consider the provisions of §13444-25 GC.

It will first be noted that this section is a section relating to procedure, and being a procedural section does not have the effect of enlarging or extending the provisions of §12873 GC, defining the crime of embezzlement. It has only the effect of determining what shall constitute prima facie evidence of embezzlement as defined in §12873 GC.

And when it affirmatively appears from the counts of an indictment as confined by a bill of particulars, and the evidence in support thereof, that a political subdivision, the owner of public funds charged to have been embezzled, has not been deprived of its property by an adverse using or holding by the person charged, although the same were credited by such person to the wrong fund for the purpose of concealing embezzlements from such fund, the provisions of §13444-25 GC as to prima facie evidence as to embezzlement have no application as no embezzlement, as defined in §12873 GC, has been committed.

The first and second counts of the indictment, as confined by the bill of particulars, and the evidence in support thereof, in the case at bar, affirmatively show that the public funds charged in these counts to have been embezzled by the defendant were deposited in the depositary provided by law and that the county was not deprived thereof by an adverse using or holding on the part of defendant. And that while said funds charged to have been embezzled by defendant were by defendant caused to be credited to the wrong account for the purpose of concealing the fact of the non-payment of taxes marked "paid" as charged in the first count, and previous embezzlements of and shortages in accounts other than the accounts to which they were credited, as charged in the

second count, such acts on the part of defendant did not constitute embezzlement within the meaning of §12873, GC.

The state in the case at bar relies on the case of State of Ohio v Baxter, 89 Oh St 269, as supporting its contention that the facts charged in the first and second counts of the indictment, as confined by the bill of particulars, and as supported by the evidence, constitute offenses under the provisions of §12873 GC.

In the third paragraph of the syllabus in that case it is stated:

"It is the design and policy of that section (referring to §12876 GC) and kindred statutes to prevent public officers and agents from using public funds in their possession or under their control, in any manner or for any purpose not expressly authorized by law."

This statement is wholly obiter and has no application to the provisions of §12873 GC, as the only question involved in that case was whether a public officer who had appropriated public funds held in trust by him in his official capacity to the payment of his individual indebtedness and later before his secret appropriation of it became known returned money of equal amount to the trust fund, was guilty of an offense under §12876, GC, and there is nothing in the facts of the case, or in the opinion, constituting a basis for the conclusion stated in the third paragraph of the syllabus. Furthermore, the statement is so general in its character as not to constitute a rule of construction for a single statute.

We, therefore, hold that the verdict and judgment on the first two counts of the indictment, as confined by the bill of particulars, are contrary to law in that in the first count, as so confined, no offense is charged, and in that there is no evidence on either count to sustain such a verdict and judgment. The judgment on these counts of the indictment will, therefore, be reversed and final judgment entered in favor of the defendant.

Counts Numbers 3, 4 and 5 of the indictment relate to transactions which are charged to have occurred while Bernstein was Deputy County Treasurer under appointment by L. G. Collister, County Treasurer, during the period extending from August 31, 1929 to April 23, 1932. These counts are based on §12876 GC, which reads as follows:

"Sec 12876 GC. Embezzlement of public property; fraudulent conversion.—Whoever, being elected or appointed to an office of public trust or profit, or an agent, clerk, servant, or employe of such officer or board thereof, embezzles or converts to his own use, or conceals with such intent, anything of value that shall come into his possession by virtue of such office or employment, is guilty of embezzlement, and, if the total value of the property embezzled in the same continuous employment or term of office, whether embezzled at one time or at different times within three years prior to the inception of the prosecution, is thirty-five dollars or more, shall be imprisoned in the penitentiary not less than one year nor more than ten years, or, if such total value is less than thirty-five dollars, shall be fined not more than two hundred dollars and imprisoned not more than thirty days, or both."

This section differs from §12873, GC, in that under its provisions the burden is on the state to prove that the property charged to have been embezzled came into the possession of the person charged with its embezzlement by virtue of his office or employment; and in that the offenses charged therein are limited to embezzlement, conversion to his own use or concealment with such intent. And the provisions of §13444-25 GC have no application to the proof of embezzlement under this section. State v Myers, 56 Oh St 340. The word "embezzles" and the word "converts" as used in this section, are used with the same meaning as they are used in §12873 GC and it is essential to either offense that the political subdivision whose property is the subject of the offense, must be deprived of its property by an adverse using or holding on the part of the accused; and the phrase "conceals with such intent" contemplates an intent on the part of the accused to deprive the political subdivision of its property by an adverse holding or use.

Under the assignment that the verdict and judgment on the third count are contrary to law, we find that there is substantial evidence tending to prove each and every element of the offense charged in this count, and the verdict and judgment thereon are not contrary to law. Whether the verdict and judgment on this count are sustained by evidence of the degree required in criminal cases will be hereafter discussed under the assignment

that the verdict and judgment are not sustained by sufficient evidence.

On the fourth count of the indictment, although it is based on a different section of the General Code, the evidence is similar in character to that on the first and second counts of the indictment, and establishes that the amount charged in this count to have been embezzled by Bernstein, had been deposited by him in the proper depositaries but had by him been credited to the wrong accounts in order to conceal embezzlements of public funds consummated by him prior to the time covered by this count of the indictment. As affirmatively shown by the evidence, the county was not deprived of the funds charged to have been embezzled, by an adverse using or holding by Bernstein, and such funds were not concealed by him with such intent. And as the county was not deprived of its funds under the facts charged in the indictment, as confined by the bill of particulars, and supported by the evidence, there is, for the reasons mentioned in connection with the disposition of the first two counts of the indictment no evidence to sustain the verdict and judgment on this count and the judgment will therefore be reversed and final judgment in favor of defendant entered on this count.

On the fifth count of the indictment there is evidence of examiner Main tending to prove that from Sept. 3, 1929 to Dec. 17, 1931, the period covered by the indictment, the shortage in the treasurer's office increased from the sum of $294,377.54 to $427,805.21; and there is evidence of Smith that the shortage which had been $510,250.07 on Sept. 3, 1929, the first date mentioned in the count, had increased to $685,871.81 by Oct. 29, 1929, and then decreased to $425,733.61 by Dec. 17, 1931, the last date mentioned in this count, from which the jury was warranted in inferring that a sum equal to the difference between $685,871.81 and $510,250.07, to-wit, $175,621.73 was abstracted and embezzled between September 3rd and October 29, 1929, and an equivalent amount afterward returned to the treasury.

Upon the fifth count of the indictment we find that there is substantial evidence tending to prove each and every element of the offense charged in this count and the verdict and judgment thereon are not contrary to law. Whether the verdict and judgment on this count are sustained by evidence of the degree required in criminal cases, will be hereafter discussed un-

der the assignment that the verdict and judgment are not sustained by sufficient evidence.

2. We now come to the consideration of whether the verdict and judgment on the various counts of the indictment are sustained by sufficient evidence.

There is evidence tending to prove beyond a reasonable doubt that the defendant Bernstein embezzled funds during Cook's two terms of office ending Dec. 21, 1928, in the sum of $685,871.81, but this is not charged in the indictment and is not a matter for consideration in this case.

If the failure to report the collection of taxes and the crediting of the funds represented by such unreported taxes to other accounts in the treasurer's office for the purpose of concealing shortages in such accounts, caused by crediting on the tax duplicate, payments that had not been made, as charged in the first count of the indictment, or caused by the embezzlement of funds occurring prior to the times covered by the second and fourth counts of the indictment, there is evidence proving beyond a reasonable doubt the offenses charged in the first, second and fourth counts of the indictment, and the verdict and judgment on these counts would be sustained by sufficient evidence. However, as we have heretofore held that under the provisions of §§12873 and 12876 GC, upon which these counts of the indictment are based, it is essential to the commission of the offenses charged in these counts of the indictment that the county should be deprived of the property embezzled, by an adverse holding or use, and that a county treasurer or deputy treasurer is not guilty of embezzlement of public funds under the provisions of either of these sections where he actually deposited such funds in the depositary of the county to the credit of the county, although he credited such funds to a wrong fund for the purpose of covering up shortages, the verdict and judgment on these counts under our holdings are not only not sustained by sufficient evidence but are not sustained by any evidence.

Coming now to a consideration of the third count of the indictment upon this assignment, there is evidence that Bernstein as deputy treasurer had ▮▮▮▮▮ charge of all cash coming into the office of the treasurer; that he was the person who daily furnished the item of undivided tax which was reported in such an amount less than the amount properly chargeable against

him, as to conceal the shortage in the treasurer's office from the time of its origin in 1928 to the time of its discovery by examiner Main, and that except for the plan and scheme placed in effect in the office by Bernstein any shortage in the office would have been revealed by the daily reports and other records kept in the office. Bernstein controlled the flow of the tax stubs from the collection department to the bookkeeping department; and maintained a private compartment in the safe in which he kept both cash and tax stubs; that through his subordinate Sensel he had charge of the tax stubs which were withheld at the time of the discovery of the shortage and dominion over them to the extent that they were delivered by Sensel to the examiner at his direction. There is also evidence of false statements made by Bernstein to examiner Main and others, designed to conceal the existence of the shortage and prevent the discovery thereof by examiners. There is also in evidence, statements made by Bernstein indicating guilty knowledge of the shortage. And from all the evidence in the case the jury was warranted in inferring and finding that the shortage existed in the treasurer's office during the entire period covered by the examination resulted from embezzlements that could not have existed or been concealed except for his connivance and participation in such embezzlement. This leaves the question to be determined as to whether the embezzlement causing such deficits in the funds of the county was made at the time and in the manner charged in this count of the indictment.

We have already referred to the evidence as applied to this count of the indictment but in connection with this assignment of error on this count we will repeat a portion of the evidence.

The count charges the abstraction of $50,386.95 in cash on Nov. 8, 1929. According to the evidence of examiner Main when Bernstein became deputy treasurer under appointment by Collister at the expiration of Bernstein's ad interim term on Sept. 3, 1929, the deficit in the county treasurer's office amounted to $294,377.54, and the deficit at the end of Collister's first term of office, which first term included the date upon which the abstraction is charged to have occurred and during all of which time Bernstein served as Deputy Treasurer, amounted to the sum of $1,174,147.21 not including the deficit of $294,377.54. According to Clewell Smith, on August 31, 1929, the net shortage in the treasury at

the close of Bernstein's term as treasurer, was $510,250.07. On October 29, 1929, which was the last half of 1928, the deficit amounted to $685,871.81; and on December 15, 1930, last half of 1929, $467,167.23.

As hereinbefore stated, Main's audit reflects bookkeeping shortages while Smith's audit reflects actual shortages. While the Main audit would indicate that there was an increase in the shortage in the treasury department during the period including November 8, 1929, Smith's audit indicates that there was a decrease rather than an increase and consequently that the amount of cash charged to have been embezzled on November 8th is not reflected by an additional deficit in the assets of the treasurer's office and consequently that there was no new or additional abstraction of funds, at or about the time charged in this count.

Under the evidence, the withholding of tax stubs from credit was the plan and means used to cover shortages in the office, and under this plan if additional funds were embezzled increasing the amount of the deficit, additional tax stubs would be withheld from credit to cover the additional shortages. Under the evidence of Main, as set forth in the statement of facts, the amount of the tax stubs withheld from credit decreased from $874,000.00 on November 7th to $803,000.00 on November 8, 1929, and continually decreased thereafter until November 15th and this computation therefore fails to reflect the abstraction of the $53,000.00 charged to have occurred on November 8th. Furthermore, the evidence shows that there was sent to the depositary on November 8th, the sum of $174,-425.82, the items of which deposit are not shown by the evidence. There is also evidence to the effect that the shortage in the cash reported may have been caused by the cashing of checks as an accommodation to persons not connected with the office, and not in connection with the transaction of official business.

Upon this state of the evidence reasonable doubt exists as to whether any funds were embezzled on or about November 8, 1929, as charged in this count, and the evidence in this respect does not conform to or comply with the degree of proof required in criminal cases, that is, proof beyond a reasonable doubt, and the verdict and judgment on this count are therefore not sustained by sufficient evidence and will be reversed for that reason and the cause remanded for a new trial on this count, and for further proceedings according to law.

Upon the fifth count of the indictment, the proof, generally, is the same as on the fourth count. As applied to the specific charge contained in this count, the evidence shows that the defendant was a deputy county treasurer of Cuyahoga County from September 3, 1929, to December 17, 1931, the dates mentioned in the count, and was the officer and employee in the office of the treasurer of Cuyahoga County in actual, direct and immediate control of the funds and records of the treasurer of Cuyahoga County, and that he concealed embezzlements which existed in the office of the treasurer, by making false and fraudulent reports of moneys received by him in the course of his employment as deputy county treasurer, and by fraudulently failing and wilfully omitting to make reports of or to correctly account for money so received by him, and causing the making of fraudulently falsified daily reports to the County Auditor, and failed and omitted to report the full, true and correct amount of taxes received daily by the treasurer of Cuyahoga County.

As shown by Main's audit, there was a deficit of $294,377.54 in the Treasurer's office on September 3, 1929, the first date mentioned in the indictment and being the date of the commencement of Collister's first term. During Collister's first term which ended September 15, 1931, an additional deficit amounting to $1,174,147.21 was created which did not include the deficit existing at the commencement of the term. This additional deficit had been reduced to $183,385 58 on April 23, 1932, so that in Collister's two terms, according to the Main audit, the net deficit created was $183,-385.58 in addition to the deficit of $294,-377.54 existing at the commencement of his first term.

Under the Smith audit, the deficit existing in the treasury on Sept. 3, 1929, the first date mentioned in the fifth count of the indictment, was $510,250.07; on October 29, 1929, this deficit had increased to the sum of $685,871.81; on December 5, 1930, the deficit had decreased to the sum of $467,167.23, and on Dec. 15, 1931, had further decreased to the sum of $425,733 61; and by April 22, 1933, had again increased to the sum of $480,251.13. Under the Smith audit the deficit in the treasurer's office existing on the first date charged in the fifth count, had increased in the sum of $175,621.73 from Sept. 3rd to Oct. 29, 1929,

which is a portion of the period covered by this count, and from this audit the jury were warranted in inferring that an additional sum of $175,621.73 had been embezzled by defendant Bernstein during this period. While the Smith audit shows a decrease in the amount of the deficit from Oct. 29, 1929 to the sum of $425,733.61, by Dec. 17, 1931, the last date mentioned in the count, indicating a return to the treasury funds in an amount more than equal to the amount embezzled between Sept. 3rd and Oct. 29, 1929, such restitution under the rule announced in the case of State v Baxter, 89 Oh St 269, does not constitute a defense to the charge of embezzlement.

The verdict and judgment on this count are sustained by evidence warranting the jury in finding the defendant guilty as charged in this count, and although the amount embezzled, as shown by the evidence, is less than the amount found in the verdict, such difference does not require either the reversal or modification of the judgment entered on the verdict on this count, as the amount embezzled 's in excess of $35.00 and the penalty under the provisions of §12876 GC is the same whether the amount embezzled equalled the amount charged in this count or the lesser amount shown by the evidence.

3. We will now proceed to the consideration of the claimed errors in the charge of the court, specified in the brief of the appellant.

The first specification is that the court in its charge used the word "guilty" twenty-eight times; while it used the words "not guilty" but three or four times, and thereby consciously or unconsciously left a definite impression upon the minds of the jury with reference to the guilt of the defendant despite his expressions of caution to the contrary. The words mentioned were correctly used in the particular phrases in which they appear and the mere fact that the word "guilty" was used more times than the words "not guilty" did not constitute error to the prejudice of the appellant.

The second specification is to the effect that the court in making its charge to the jury separated the first two counts from the last three in the indictment because they were drawn under different sections of the General Code, and then instead of charging each count separately and explaining to the jury the manner in which the defendant might be found guilty or not guilty under each count, grouped the first two counts under a single charge and did the same thing with the last three. The charge correctly separated and defined the issues insofar as it purported to do so. There was no request on the part of the defendant for a further separation or definition of the issues on the various counts, and in the absence of such request the court was not obliged to further separate and define the issues and his failure to do so was not error.

The third specification is that the court charged the jury that "the charge against the defendant is set forth in the indictment which has been read to you at the outset of the case, and the bill of particulars. You will have both of these papers with you on retiring to your room for deliberation" and then over the objection of counsel for defendant permitted the bill of particulars to go to the jury during their deliberation with regard to finding a verdict.

As the bill of particulars confined the state in its proof under the indictment, the charges mentioned and the action of the court in permitting the bill of particulars to go to the jury during their deliberations was beneficial to the defendant and not prejudicial to him and therefore not erroneous.

The fourth, fifth, sixth, seventh, eighth, ninth and tenth specifications in the brief as to errors in the charge relate to claimed error in the charge on the first two counts of the indictment.

As we have already held that the finding and judgment on these two counts of the indictment are contrary to law in that they are not sustained by any evidence, it is unnecessary to consider such claimed errors in the charge. As the charges complained of in these specifications were definitely limited by the court to the first two counts of the indictment and did not apply to the last three counts, any errors that may have occurred in the same do not affect the charge on the last three counts of the indictment.

The eleventh and twelfth specifications of error in the charge relate exclusively to the charge on the last three counts of the indictment and the eleventh specification claims error in the court charging the provisions of §13444-19 GC the similar crime statute.

Under the evidence in this case the pro-

311

visions of §13444-19 **GC** were applicable and the court did not err in ▮▮▮ charging this section. There was no request by defendant at the time evidence relating to similar cases was introduced, that the court limit the evidence to the specific purpose for which it might or could be admitted, and in the absence of such request, the defendant cannot complain of the failure of the court to limit the evidence at the time it was introduced, to the specific purpose for which it was admitted. The court properly limited this evidence, in its general charge to the jury.

The twelfth specification as to error in the charge relates to the court in its charge explaining the provisions of §13444-19 **GC.** As the provisions of this section were properly charged, the explanation of the provisions of the section which is in proper form and accurately states the law, was properly charged.

There is no thirteenth specification of error in the charge.

The fourteenth specification ▮▮▮ relates to that part of the general charge reading as follows:

"It is always the privilege of the accused to put his character and reputation in evidence, or not, as he may choose. The defendant has done so in this case and has offered evidence tending to show a reputation for honesty, probity and for truthfulness. This he has done in order to raise a presumption of innocence, as evidenced by the general character and reputation, since it is not probable that a person of known probity, honesty and truthfulness would commit a crime of this character. I can only add the general rule that as against guilt clearly proven good character will not avail to acquit. Evidence of this kind is to go to a jury and its weight and effect is to be determined by you in connection with all the other facts and circumstances of the case in arriving at the question of guilt or innocence of the accused."

The particular part complained of is the clause reading: "This he has done in order to raise a presumption of innocence."

In the case of **Moran v State of Ohio,** 9 C.C. 464, it was held that a special request to charge on the part of the defendant incorporating a clause similar to the clause in the foregoing instruction particularly complained of, was properly re-

fused as being too favorable to the defendant.

The court in its general charge in the case at bar, had, prior to the giving of the instructions complained of, charged the provisions of §13444-3 **GC,** as to presumption of innocence. The charge complained of did not in its phraseology in any way refer to or limit the previous instruction on presumption of innocence, and considering its phraseology as a whole, the contention of appellant that it had the effect of depriving the defendant of the benefit of the original charge on presumption of innocence is without merit. Its only effect was to give defendant the benefit of an additional presumption of innocence. The part of the instruction following the clause complained of, correctly states the law with reference to the effect that may be given to evidence tending to show the reputation of defendant for honesty, probity and truthfulness, and on the whole the instruction complained of is more favorable to defendant than he would have been entitled to under the law. While the clause complained of does not accurately state the law, the giving of the instruction as a whole was not prejudicial to defendant.

The fifteenth specification of ▮▮▮ error in the charge is directed at that part of the charge which reads as follows:

"Defendant himself has testified as a witness in this case and you should weigh his testimony in the same manner as you would weigh the testimony of any other witness. The jury would not disregard his testimony merely because he is the defendant and stands charged with the commission of a crime but in weighing his testimony you should consider his interest in the result of the case, his manner of testifying and the probability or improbability of what he says."

It is the contention of defendant that the court erred in singling out the testimony of defendant as something specific to instruct the jury about. The charge correctly states the law and was not in any way prejudicial to the defendant.

The sixteenth specification of error is directed to a colloquy occurring between the court and one of the jurors after the jury had retired to deliberate on their verdict and had then returned to the court room for the purpose of requesting further instructions. The colloquy is too long to

repeat here but upon an examination of all the colloquy we find no error was committed to the prejudice of defendant in such colloquy.

Exception is also taken to the statement of the court in answer to a question by a juror as to whether or ▇▇▇▇ not it was possible for a jury to arbitrate the case without referring to any of the exhibits, to the effect that the court thought it would be more advisable even though the jury remembered what is in the exhibits, to refer to them so as to confirm your understanding of them. The statement mentioned was neither erroneous nor prejudicial to defendant.

On the whole, we find no error prejudicial to defendant in the particulars specified in the brief of appellant, in the general charge.

For the reasons thereinbefore mentioned, the judgment of the Common Pleas Court on the first, second and fourth counts of the indictment will be reversed as being contrary to law in that the judgment on such counts is not sustained by any evidence, and final judgment will be entered on such counts in favor of appellant; and the judgment on the third count of the indictment will be reversed as not being sustained by sufficient evidence and as to this count the case will be remanded to the Court of Common Pleas for a new trial and further proceedings according to law; and the judgment on the fifth count of the indictment will be affirmed and the cause as to this count remanded to the Common Pleas Court for resentence in accordance with the opinion, by omitting that part of the sentence on this count requiring the same to be served concurrently with the sentence on the first count of the indictment; and one-half of the costs of this appeal will be taxed against the appellant and the other half will be taxed against the appellee. Exceptions are saved to the parties severally.

KLINGER, PJ, and HONRBECK, J, concur in decision and opinion except that part thereof holding that the judgment of the Common Pleas Court on the fifth count of the indictment is sustained by sufficient evidence, to which they dissent, they being of the opinion that the judgment on each of the five counts of the indictment is not sustained by sufficient evidence.